1
2
3
4
5
6
7

**Alan G. Dowling**
(California Bar No. 70686)
Email: agdowling@aol.com
**ALAN G. DOWLING, P.C.**
1043 Pacific Street, No. 1
Santa Monica, California 90405
Telephone: (818) 679-6395
Fax: (424) 238-5366
*Attorney for Plaintiffs*

8
9
10
11
12
13

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| **Mark Jones**, an individual, **George Saadi**, an individual, and **Vamprechaun Productions, LLC**, a California limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>**Lance Eric Thompson**, an individual, **Connie Diane Thompson**, an individual, **Portsmouth Pictures, LLC,** a Michigan limited liability company, and **Does 1 through 10**, Inclusive,<br><br>Defendants<br>_____ | Case No. 2:17-cv-1619<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT, DECLARATORY RELIEF, SLANDER OF TITLE, AND INTENTIONAL AND NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiffs **Mark Jones**, an individual ("Jones"), **George Saadi**, an individual ("Saadi"), and **Vamprechaun Productions, LLC**, a California limited liability company ("Vamprechaun Productions"), collectively "Plaintiffs," allege as follows:

## JURISDICTION AND VENUE

1.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act of the United States, 17 U.S.C. §101, *et seq.,* declaratory relief, and damages and injunctive relief for slander of title and for intentional and negligent interference with prospective economic advantage.

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1338(a) and 1367.  Specifically, the Court has federal question jurisdiction in this matter, in that Plaintiffs seek injunctive relief and damages against the Defendants under the Copyright Act of 1976 (17 U.S.C. §501-505, inclusive).  The Court has jurisdiction over Plaintiff's claims for declaratory relief, slander of title, and intentional and negligent interference with prospective economic advantage in that each involves a substantial federal question and, under the doctrine of supplemental jurisdiction, each such claim is so related to the copyright claims in this action, arising from a common nucleus of operative facts, that they form part of the same case or controversy under Article III of the United States Constitution.

3.     This Court has personal jurisdiction over each of Defendants because each resides in, is domiciled in and/or does systematic and continuous business in the State of California and in this judicial district, various acts complained of herein occurred in the State of California and in this judicial district, and/or Defendants have caused injury to Plaintiffs and to Plaintiffs' intellectual property

and other proprietary and economic interests within the State of California and in this judicial district.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (c), and/or §1400(a).

## THE PARTIES

### *PLAINTIFFS*

5.    Plaintiff Mark Jones ("Jones"), is now and at all times material hereto has been an individual citizen of the United States of America, residing in the County of Los Angeles, State of California.  At all times material hereto, Jones has done business in the State of California and throughout the United States, including in this judicial district.  For many years, Jones has been engaged in, among other things, the business of creating, writing, producing, directing and exploiting motion picture and television productions and projects, and owning, licensing and exploiting the copyrights and other rights therein.

6.    For over 40 years, Jones has been a successful and prolific screenwriter, director and producer of feature films and television programs.  He began with animated cartoon television series, working with Filmation, Hanna-Barbera, Ruby Spears and others, on shows for all three major television networks, including shows such as *Super Friends* and *Scooby Doo*.  Jones went on to write and produced live action television series and pilots, including *The A-Team, Hunter, Knight Rider, Fall Guy, BJ and The Bear,* and *Riptide,* among others.  Jones also directed several television shows.  His feature film writing and directing debut came with the horror-comedy classic *Leprechaun* in 1993, which spawned five sequels and a re-boot.  Jones went on to write or direct features including *Rumpelstiltskin* (for Dino DeLaurentiis and Paramount), *Triloquist* (released by The Weinstein Company), and *Scorned* (released by Anchor Bay Entertainment).

Jones's screenwriting has included features for Tri-Star, Universal, Disney and Warner Bros.  For many years, including at all times material hereto, Jones has invested substantial sums of money, as well as time, effort, resources and creative talent, to create, develop, own, copyright, license, produce and otherwise exploit entertainment characters, literary works including scripts, screenplays, and copyrighted motion picture productions.

7.     Plaintiff George Saadi ("Saadi"), is now and at all times material hereto has been an individual citizen of the United States of America, residing in the County of Los Angeles, State of California.  At all times material hereto, Saadi has done business in the State of California and throughout the United States, including in this judicial district.  For many years, Saadi has been engaged in, among other things, the business of creating, writing, producing, directing and exploiting television productions and projects, and owning, licensing and exploiting the copyrights and other rights therein.

8.     Saadi has nearly 30 years of experience in the music and television industries, and as a journalist.  Saadi holds a Bachelor of Music: Professional Music degree from the Berklee College of Music, and dual Masters Degrees in Music Industry and Business Administration from the University of Miami.  From 1989-1997, Saadi worked as an executive at Capitol-EMI Music, Inc., in a variety of capacities, involving artist development, marketing, presentation services and special projects.  Between 1988 and 1993 he founded and ran Vigilante Records, working with the *American Gladiators* television show and various recording and performing artists, and producing recordings.  From 1995-1998, Saadi was also the creator, producer and director of the cable television music series *The Street Buzz*, reaching over 30 million homes throughout the United States six times a week. From 1999-2003, Saadi worked as a journalist for Clear Channel, in connection

with its magazines *Album Network, Counter-Intelligence* and *Network Magazine*, and conceiving and developing a music television program concept resulting in a joint venture between Clear Channel and Dick Clark Productions. Since 2003, Saadi has worked in conjunction with Aucoin Globe (managers of legendary rock band KISS, *inter alia*), Welk Music Group, A&R Worldwide, and Ace's Choice Entertainment (developing several television projects). In 2015-2016, Saadi created, wrote and produced "Buried History," an Emmy-nominated television program shown on PBS, in partnership the Dick Clark Company. In 2016, Saadi, with Jones, formed Saadi-Jones Productions, LLC, and Vamprechaun Productions, LLC, for the production of a motion picture with the working title "Vamprechaun."

9. Plaintiff Vamprechaun Productions, LLC, ("Vamprechaun Productions") is now and at all times material hereto has been a limited liability company duly organized and existing under and pursuant to the laws of the State of California, with its principal place of business in the County of Los Angeles, State of California. At all times material hereto, Vamprechaun Productions has conducted its business in the State of California and elsewhere in the United States, including in this judicial district. The members and managers of Vamprechaun Productions are now, and at all times material hereto have been, Jones and Saadi. VPLLC was specifically formed by Jones and Saadi for the purpose of owning, developing and exploiting rights in, and contracting for and carrying out the production of, the motion picture project currently known by the working title "Vamprechaun," based on the screenplay of that title by Jones.

### *DEFENDANTS*

10. On information and belief, Defendant Lance Eric Thompson (hereinafter sometimes referred to solely as "Thompson") is now and at all

times material hereto has been an individual citizen of the United States of America, residing in the County of Los Angeles, State of California. At all times material hereto, Thompson has conducted business in the State of California and elsewhere in the United States, including in this judicial district. On further information and belief, at all times material hereto, Defendant Lance Eric Thompson has been and is married to Defendant Connie Diane Thompson (hereinafter sometimes referred to as "Connie Thompson"), and was co-Petitioner in bankruptcy proceedings filed with Connie Thompson in 2015 and 2016, as detailed hereinbelow.

11.   On information and belief, Defendant Lance Eric Thompson claims to hold a B.A. degree in cinematography from The Ohio State University, and a J.D. degree from Capital University in Columbus, Ohio. For years, Thompson has held himself out as an attorney, working from offices in Burbank, California, practicing in the entertainment industry. He has also formed at least two entertainment production companies, Portsmouth Pictures, LLC (in 2010) and Film Brokers International, Inc. (active from 1997-2009) with respect to which he claimed to be responsible for "legal affairs matters," *inter alia*, and two other companies, Loss Prevention Laboratories (from 2012-2015) and something called The AVAStore, LLC. Thompson has claimed that, prior to 1998, he was a "Vice President for Business Affairs and Senior Vice President" at Four Star International (New World Entertainment, Inc.) and "President of International" at Kaleidoscope. Thompson has also claimed that, early in his career, he worked as "Counsel for Business Affairs" for Orion Television.

12.   On information and belief, although Thompson was formerly licensed to practice law in the State of Ohio, beginning in 1984, but Thompson voluntarily assumed "inactive" status in Ohio in 2001 and has remained "inactive" ever since

then.  As such, under the rules governing the licensing of attorneys in the State of Ohio, since 2001 Thompson has been forbidden to practice law in Ohio or to hold himself out as authorized to practice law in Ohio.  On further information and belief, Defendant Lance Eric Thompson has never been licensed or authorized to practice law in the State of California or in any other state of the United States.

13.   On information and belief, Defendant Connie Diane Thompson ("Connie Thompson") is now and at all times material hereto has been an individual citizen of the United States of America, residing in the County of Los Angeles, State of California, and therefore within this judicial district.  On further information and belief, at all times material hereto, Defendant Connie Thompson has been and is married to Defendant Lance Eric Thompson, and co-Petitioner in bankruptcy proceedings filed with Lance Eric Thompson in 2015 and 2016.

14.   On information and belief, Defendant Portsmouth Pictures, LLC ("Portsmouth Pictures"), is now and at all times material hereto has been a limited liability company organized under the laws of the State of Michigan, maintaining its principal place of business in Burbank, California.  On further information and belief, at various times from its inception up through and including at least May 17, 2015, Defendant Lance Eric Thompson was a founding member of, and the owner of fifty percent (50%) of the equity interest in, Portsmouth Pictures.

## ALLEGATIONS COMMON TO ALL CLAIMS
### BACKGROUND OF THE "VAMPRECHAUN"
### MOTION PICTURE PROJECT

15.   In or before 2009, Jones, alone, created the idea for a fictitious character he termed the "vamprechaun"—part vampire and part leprechaun.  Jones

"pitched" the idea of a motion picture or television production based on that character to various of his writer friends and entertainment business associates as early as 2009, and on several occasions thereafter prior to 2013. Also prior to 2013, Jones developed the "vamprechaun" character, making notes (and crude drawings) regarding its possible appearance, characteristics, personality traits, and with regard to the story line.

16.     Since early 2009, Jones had also been working on another of his motion picture projects, entitled "Scorned." "Scorned" was further along in development than the "vamprechaun" idea. The screenplay for "Scorned" had been co-authored in or about 2009 by Jones and Sadie Katz, who also acted in the film. Jones was also to be the director. In looking for financing for "Scorned" from and after 2009, Jones had met with several individuals who expressed interest in the project and claimed to be able, potentially, to obtain financing for it. Jones of course encouraged each of them to seek the financing, on the understanding that if (but only if) they succeeded in obtaining financing, and the project went forward using the financing they obtained, they would be part of the production team, receiving an appropriate production credit and compensation, the particulars of which would later be determined according to the circumstances. That process of seeking financing from multiple potential sources and arranging production accordingly, is typical in the motion picture industry, especially for smaller, independent films.

17.     One of the individuals Jones met when seeking financing for "Scorned" was Defendant Lance Eric Thompson ("Thompson"). Thompson, who lived in, and maintained his principal place of business in, Los Angeles County, California, held himself out not only as experienced in motion picture finance and production, but also as an experienced entertainment industry attorney who could

provide the production legal services for the "Scorned" project.

18.     Ultimately, Thompson was able to secure financing for "Scorned" from Anchor Bay Entertainment ("Anchor Bay"), a subsidiary of Lionsgate Home Entertainment ("Lionsgate"), engaged in the financing, production and distribution of feature films, television shows, specials and series, and short films, also including independent and direct-to-video films. As a consequence of Thompson securing that financing, Jones and Thompson formed a partnership, and executed a written partnership agreement. For that purpose, Thompson used a business entity called Portsmouth Pictures LLC, a Michigan limited liability company—and one of the Defendants herein—that Thompson had formed for other purposes on August 6, 2010, and registered with the State of Ohio on June 6, 2012 (approved on July 31, 2012), but which from its inception maintained, and still maintains, its principal place of business in Burbank, California.  Pursuant to the partnership agreement with Jones, Portsmouth Pictures became one of the credited producers of "Scorned."  Thompson acted as production attorney for the film, participating in the drafting and review of the financing agreements for the film; arranging, applying for and obtaining Ohio tax credits; and preparing the contracts with the talent, including actors, producer, director, crew and vendors on the project. "Scorned" was shot largely in and around Portsmouth, Ohio, and completed in California, in 2012, and ultimately released on February 4, 2014.

19.     During the production period for "Scorned," and into 2013, Jones continued to pursue his "vamprechaun" project, on his own, speaking with a number of individuals regarding potential financing.  As yet, Jones only had his own ideas and notes; there was no complete script embodying the idea.

### THOMPSON'S INVOLVEMENT IN THE "VAMPRECAUN" PROJECT

20.     On a date in 2013 prior to July 2013, Jones and Thompson had a

breakfast meeting scheduled with a third party, at the W Hotel in Los Angeles, California, concerning "Scorned."   While they were driving to the breakfast meeting, Jones mentioned to Thompson that Jones had had an idea for a character – part vampire and part leprechaun -- that he had been thinking of as a potential horror-comedy for several years.  Jones had never previously discussed the idea at all with Thompson, and in that conversation only cursorily described the character (as just indicated) and possible variations on the name for it.   Thompson expressed enthusiasm for the idea and a willingness to seeking financing for such a project, but noted that, in order for him to approach third parties about financing, there would need to be a script.  On that drive, Jones and Thompson did not discuss either the character or the story line, or the project, in any further detail.  Jones simply explained that the idea involved a leprechaun who is bitten by a vampire and becomes one himself.

21.   For Jones to create a script embodying the "vamprechaun" character "on spec" he would have to work for up to two months, without compensation. Nevertheless, Jones decided to go ahead and do so, and by late July 2013 Jones had completed his script, which he entitled "Vamprechaun."  As was his practice, in order to protect his intellectual property interests, immediately upon completing it, Jones registered his script, "Vamprechaun" by Mark Jones, with the Writers Guild of America West, Inc., on August 5, 2013 (registration number 1668680). Jones made Thompson aware of this registration before the script was permitted to be disclosed to any third parties.

22.   Jones is the sole and exclusive owner of exclusive rights, under the Copyright Act (17. U.S.C. Sec. 101 et seq.) and other laws of the United States and the State of California, in and to that certain literary work consisting of the script entitled "Vamprechaun." As sole author and copyright claimant, Jones formally

registered his claim of copyright in the script with the Register of Copyrights, U.S. Copyright Office, as a literary work completed in 2013, receiving copyright registration number TXu 2019581, effective as of September 8, 2016.

23.     In 2013, Jones presented a copy of the script entitled "Vamprechaun" to Thompson so that Thompson could follow up on his expressed interest in pursuing financing for the project.  Again, as with "Scorned," Jones and Thompson proceeded with the express understanding that if (but only if) Thompson succeeded in obtaining financing, and the project went forward using the financing he obtained, he would be part of the production team, receiving an appropriate production credit and compensation, the particulars of which would later be determined according to the circumstances.  Since Thompson had not obtained any financing, and was not the only potential source or avenue for obtaining it -- Jones was still talking to others, and Thompson knew so -- Thompson and Jones did not form any partnership or other joint form of business entity at that time, pertaining to the "Vamprechaun" project.  Indeed, they never did so, nor did they ever agree to do so.

24.     Commencing in or around late 2013, Thompson undertook to look for financing for the "Vamprechaun" project, in the hope that, if (but only if) he obtained it, he would become a formal part of the project, receiving credit and compensation (as he had with "Scorned") as one of the producers.  On information and belief, at the same time, Thompson and Jones, independent of each other, were each working with other people on various projects in various stages of development.  On further information and belief, Thompson approached several entities about "Vamprechaun," including the SyFy Channel (presumably with the idea of creating a television movie or series) and Anchor Bay Entertainment. Thompson created and circulated various written and printed materials, and

website information, concerning "Vamprechaun."  Those materials of which Jones was aware in advance made it clear that Jones was the creator of the "Vamprechaun" character, the sole author of the script, and would be the director of the film—as he had done with the successful "Leprechaun" series, before.  On information and belief, in various written or visual materials prepared by Thompson and communicated to third parties, including potential investors, Thompson also misrepresented that Portsmouth Pictures was and would be involved in the "Vamprechaun" production. In addition to approaching a few potential financing sources, as just noted, Thompson then took it on himself to try to set up "crowd funding" websites, with Slated and Indygogo.  (Jones had serious reservations about those efforts, and shut them down.)

25.    None of Thompson's financing efforts were successful, and as far as "Vamprechaun" was concerned, he and Jones parted ways.  Over the next two years or more, when Jones and Thompson, on rare occasions, spoke with each other, it was not about "Vamprechaun," but about "Scorned."  Indeed, an entire year went by when they did not speak at all.

26.    Saadi and Jones had met, socially, prior to 2013.  As of early November 2013, Saadi was aware of Jones's "Vamprechaun" idea, and that Jones was still looking for financing.  Saadi introduced Jones to two of Saadi's friends who had achieved success in the entertainment business, one of whom was former championship boxer Ray "Boom Boom" Mancini.  Subsequently, Saadi had an opportunity to pitch project ideas to the Dick Clark Company, with whom Saadi had worked on various projects in development for a number of years. Saadi pitched his own idea for a television program, Jones's idea for "Vamprechaun," and Mancini's idea for a project.  The Dick Clark Company decided not to proceed with "Vamprechaun," but Saadi and Jones stayed in touch.

27.    In July 2016, Saadi received a social invitation from John Ferraro, Sr. ("Senior"), the creator and producer of the successful "American Gladiators" television series, with whom Saadi had previously worked. Senior was in Los Angeles with his son Jon Cafaro Ferraro ("Jon"), who had just finished film school.  Saadi invited Jones to meet with the Ferraros, on July 20, 2016, as Jones had experience that might be useful to the Ferraros on a project Jon was then exploring.  As it turned out, Jon was familiar with Jones's work and reputation, and expressed admiration for him.  Over the course of that meeting, Jones mentioned "Vamprechaun," and the Ferraros expressed interest in the project, but there was no substantive discussion about it.  At the Ferraros' request, Jones sent them the "Vamprechaun" script to look over, and the Ferraros, in turn, promptly indicated an interest in financing the project themselves. Thompson had nothing to do with obtaining the Ferraro financing.

28.    Shortly thereafter, Senior raised a question about whether they could be sure that "Vamprechaun" would not invite some sort of potential claim of infringement from owners of the "Leprechaun" film rights.  Jones recalled that, on the "Scorned" project, Thompson had held himself out as an experienced entertainment attorney.  Although they had not spoken in a year, and had not spoken about the "Vamprechaun" project at all since some time in 2014, Jones contacted Thompson and asked if he could provide a legal opinion for the Ferraros on that issue that would hopefully give the Ferraros sufficient comfort to continue forward.  Thompson agreed.

29.    On July 30, 2016, Thompson, at Jones's request, sent directly to Senior his written legal opinion regarding the issue of potential infringement claims. In his legal opinion letter, Thompson stated among other things:

a)    "I'll be doing the business/legal affairs for the project;"

b)      "Any future claim of infringement based on the Vamprechaun character or the script would be spurious;"

c)      "Vamprechaun" is an orignal [sic] blending of public domain creatures that does not represent an infringement;" and

d)      "The blending of those two characters [a leprechaun and a vampire] create a wholly original character, not in the public domain."

30.    The Ferraros, Jones and Saadi decided to proceed forward, and over the next several weeks, events moved quickly.

31.    In order potentially to enhance the budget for "Vamprechaun," Jones, Saadi and Vamprechaun Productions also considered where it would be practicable to shoot the film, and what potential tax credits might be obtained based on that location.  As part of the latter analysis, Jones recalled that, on the "Scorned" project, Thompson had held himself out as an experienced entertainment attorney with special knowledge about obtaining tax credits, in particular in Ohio, and had handled the legal work necessary to obtain such tax credits on that picture.   Jones therefore naturally reached out to Thompson as an attorney to see if he wanted to explore the possibility of obtaining Ohio tax credits for the "Vamprechaun" project.  Saadi and Jones had serious reservations about other potential production problems in Ohio due to weather, crews, unions, and the cost of bringing people from California to Ohio for the shooting, in light of the small budget for this independent film project, but were willing to take the viability of potential tax credits into account in making a final decision.

32.    Thompson expressed enthusiasm about his ability to find more money for the film by obtaining Ohio tax credit approval, and undertook to prepare drafts of necessary papers.  Although Saadi and Jones had already been preparing the proposed budget for the project, Thompson, acting apart from them, prepared what

purported to be a "budget" for the project that he intended to be sent to Ohio tax authorities, aimed at justifying the amount of tax credit he hoped to arrange for. That "budget" was grossly inflated and erroneous.  It purported to set the budget at $2,750,000, and included hundreds of thousands of dollars in unapproved, undiscussed budget items aimed at compensating Thompson for services nobody had agreed he would be rendering.  It was immediately apparent to Jones and Saadi that Thompson's budget was impracticable and totally unacceptable on its face, and would have been fraudulent if presented to the State of Ohio and to the Ferraros.  Between that and their other reservations about shooting in Ohio, Saadi and Jones determined not to shoot the film in Ohio, and so informed Thompson.

33.    Thompson clearly intended to insinuate himself as a production attorney on the project and, purporting to act as such, had also undertaken to draft what he termed a "Film Financing Agreement," with the intent that it be presented to the Ferraros, when in fact the Ferraros' attorney was charged with responsibility for preparing any such document in the first instance.  In that draft agreement, which he dated as of August 15, 2016, Thompson falsely referred to an entity supposedly named "Vamprechaun LLC, an Ohio limited liability company" (which has never existed, in fact), and to "Mansky Productions LLC, a Delaware corporation [sic]," which in fact was and is a Florida limited liability company. Jones and Saadi made clear to Thompson that he had no further or ongoing involvement in the project.

34.    On September 8, 2016, Thompson wrote to Jones, referring to the two of them for the first time as a purported "team/partnership."  Thompson extolled the work he claimed to have "put into this latest deal with the Ferraros including budgets, the deal with their production company, legal opinions on copyright issues related to Leprechaun, etc., etc., etc."  He went on to claim that "The

Vamprechaun character was created by both of us at the W breakfast." Thompson then attempted to extort Jones by threatening to contact the Ferraros and Saadi with his assertions. Jones of course advised them of this turn of events on his own initiative.

35.    Saadi's brother, Edward Saadi, an attorney, wrote to Thompson on Jones's and Saadi's behalf on September 10, 2016, unequivocally refuting Thompson's assertions, and specifically stating that there was never any partnership between Thompson and Jones, and that Thompson had no rights in any intellectual property relating to "Vamprechaun," including without limitation the character, and warning him that if he followed up on his threats to communicate with third parties in such a way as to cloud title to the project it would constitute, among other things, tortious interference.

36.    Nothing further was heard from Thompson thereafter, and Jones, Saadi and the Ferraros proceeded with their efforts to complete the financing arrangements and move forward with the production. On September 12, 2016, Jones and Saadi formed an entity through which to jointly conduct their business, calling it Saadi-Jones Productions, LLC, a California limited liability company. On October 4, 2016, Jones and Saadi formed a separate entity, Vamprechaun Productions, LLC, a California limited liability company, through which they could enter into contracts and engage in business pertaining specifically to the "Vamprechaun" project. Jones, Saadi and Vamprechaun Productions also began to explore obtaining errors and omissions insurance and a completion bond for the project.

37.    By October 20, 2016, with the assistance of legal counsel (not including Thompson) a final draft of the Terms and Conditions of a financing agreement had been negotiated by Mansky Productions, LLC (the Ferraro

company) and Vamprechaun Productions, LLC (Jones and Saadi), which the parties thereto were about to sign forthwith.   In connection therewith, a budget had been formulated, as the basis for those negotiations, which provided, among other things, that Jones would receive $85,000 for the purchase of the "Vamprechaun" script, Jones would receive $85,000 for his services as director of the motion picture based on that script, and Saadi would receive $85,000 as a producer of that motion picture.  Additionally, under the negotiated Terms and Conditions, Vamprechaun Productions would become owner of fifty percent (50%) of the copyright in the "Vamprechaun" script, the motion picture itself, and all derivative works of all kinds, in all media, in perpetuity, and would receive fifty percent (50%) of the producer's share of all net profits from exploitation of the "Vamprechaun" properties and rights.  As of that date, the parties to the Terms and Conditions anticipated funding of the motion picture's agreed financing within a matter of weeks, and for the shooting of the motion picture in early 2017.

38.   However, on October 20, 2016, Thompson sent an email directly to Jon (Jon Cafaro Ferraro, the son), in which Thompson referred to his own legal "opinion as to Vamprechaun's rights" of July 30, 2016, and stated, among other things, "I have been a partner in the project from the very beginning (back in 2013) and co-created the Vamprechaun character with Mark Jones at that time." Thompson claimed to have a "voluminous" amount of "background material" in support of his claim, expressed full awareness that he was "muddying the waters" for the project, and asked for the name of the Ferraros' attorney.  Jon forwarded the email to his father (Senior), and Senior responded by asking Thompson to provide, immediately, the "voluminous" documentary evidence that Thompson had claimed in his email to have, supporting his assertions.  Thompson failed and expressly refused to do so.  In subsequent correspondence Thompson also threatened to

contact errors and omissions insurance and completion bond companies to cloud title to the "Vamprechaun" project, which he knew would make it functionally impossible to complete the financing or proceed with the production. The Ferraros of course advised their attorney of these developments.

39.    On October 24, 2016, Jones and Saadi (and, therefore, Vamprechaun Productions, LLC) learned for the first time that Thompson had never in fact been licensed by the State of California to practice law in California, although Thompson, working from his offices in Burbank, California, for a California client, Jones, had purported to be acting as attorney for the "Vamprechaun" project in rendering his opinion letter of July 30, 2016, preparing the purported "budget" and "Film Financing Agreement" for submission to Ohio tax authorities, and holding himself out as intended production counsel on "Vamprechaun." Subsequently, Plantiffs learned that Thompson had also not been authorized to actively practice law in Ohio, or hold himself out as authorized to do so, since 2001. To date, Thompson has never acknowledged such facts, instead referring repeatedly to his experience as an attorney, and his claimed efforts as such, on the "Vamprechaun" project. At least until October 24, 2016, Jones, and Saadi and Vamprechaun Productions, LLC, reasonably relied on the information and belief that Thompson was a duly licensed attorney at all times. In reliance upon Thompson's statements that he could (lawfully) act as attorney in connection with the "Vamprechaun" production, Jones had sought his legal opinion letter regarding potential infringement issues, used it to induce the Ferraros to negotiate for financing of the project, relied on Thompson to explore obtaining Ohio tax credits, incurred (along with Vamprechaun Productions) substantial legal fees in connection with the negotiations with the Ferraros/Mansky Productions LLC, and devoted several months to seeking to arrange and finalize such financing and arranging the

production of the film.

40.   As a direct and proximate result of Defendant Thompson's wrongful actions complained of herein, on December 9, 2016, the Ferraros/Mansky Productions gave notice to Jones, Saadi and Vamprechaun Productions that due to Thompson's unresolved claims they would not be going forward with the financing of the "Vamprechaun" project, and they withdrew from it.

41.   In sum, Thompson never himself obtained financing for the "Vamprechaun" project, from the Ferraros or anyone else; he never obtained state tax credits, in Ohio or anywhere else; and he never lawfully performed as a "production attorney" or otherwise rendered legal services on the project, although he repeatedly held himself out as such to others.  Certainly, there was never any partnership or other joint business organization formed between Thompson and Jones, pertaining to the project.  Thompson did not, in fact, create (or "co-create") the Vamprechaun character—which had in fact been created years before he ever heard of it—and he had no part whatsoever in the drafting of the "Vamprechaun" script, and has no copyright or other rights therein.  Thompson's communications with the Ferraros, wrongfully asserting that he was Jones's "partner in the project," and that he (Thompson) had been "co-creator" of the "vamprechaun" character (and therefore, by implication, that he had some right, title or interest in the "Vamprechaun" script, or the right to object to its exploitation), clouded title to the character, script and project; called into question the rights of Jones, Saadi and Vamprechaun Productions to proceed with the project in the absence of, and without the consent of, Thompson; injured the reputations of Jones, Saadi and Vamprechaun Productions by falsely making it appear they had been knowingly and dishonestly proceeding and seeking financing while concealing Thompson's alleged involvement and rights, and in derogation thereof; unlawfully interfered

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

with their ability to obtain errors and omissions insurance and a completion bond, thereby effectively precluding the financing of the project; and directly resulted in the Ferraros/Mansky Productions withdrawing from the deal with Vamprechaun Productions that they had been on the verge of signing, immediately prior to Thompson's interference (indeed, on that very day); leaving the "Vamprechaun" project dead in the water and Jones's copyrighted script unusable.

### THE MULTIPLE THOMPSON BANKRUPTCIES
### AND THEIR EFFECT

42.     On information and belief, on September 30, 2009, Defendant Lance Eric Thompson filed a Voluntary Petition in the United State Bankruptcy Court for the Central District of California, under Chapter 7 of the Bankruptcy Code (Case No. 2:09-bk-36527-SB).  His bankruptcy, pursuant to that Petition, was discharged effective January 22, 2010.  (This is hereinafter referred to as the "2009 Bankruptcy".)

43.     On information and belief, on May 18, 2015, Defendant Lance Eric Thompson and his wife, Defendant Connie Diane Thompson, jointly filed a Voluntary Petition in the United State Bankruptcy Court for the Central District of California, under Chapter 13 of the Bankruptcy Code (Case No. 2:15-bk-17932-NB).  That bankruptcy was converted by the debtors from Chapter 13 to Chapter 7 on June 24, 2015.  The Thompsons' bankruptcy under Chapter 7, pursuant to that Petition, was discharged effective April 8, 2016.  (This is hereinafter referred to as the "2015 Bankruptcy".)

44.     On information and belief, on September 9, 2016, Defendant Lance Eric Thompson and his wife, Defendant Connie Diane Thompson, jointly filed a Voluntary Petition in the United State Bankruptcy Court for the Central District of California, under Chapter 13 of the Bankruptcy Code (Case No. 2:16-bk-22203-

WB). The Thompsons' bankruptcy under Chapter 13, pursuant to that Petition, was ordered dismissed for failure to appear at the Section 341(a) meeting of creditors, on October 28, 2016.  (This is hereinafter referred to as the "2016 Bankruptcy".)

45.    In the aforesaid 2009, 2015 and 2016 Bankruptcies, Defendants Lance Eric Thompson (in all three) and Connie Diane Thompson (in the 2015 and 2016 Bankruptcies) were required by law to disclose, under penalty of perjury, all tangible and intangible assets owned or claimed by them, including without limitation ownership or equity interests in business entities (such as corporations, limited liability companies, partnerships, sole proprietorships, and the like), all intellectual properties (such as copyrights, trademarks or patents, and rights, title or interests therein), and all choses in action (including without limitation claims for relief, causes of action, and the like).  In none of their petitions in bankruptcy did either of Defendants Lance Eric Thompson and Connie Diane Thompson disclose any claim to rights, title or interests as creator or co-creator of the 'Vamprechaun" character, any rights, title or interest in or to the copyrighted script "Vamprechaun" by Mark Jones, any aspect whatsoever of the "Vamprechaun" project or production, any rights, title or interests under or with respect to any actual or proposed deal with the Ferraros or Mansky Productions, LLC, and right, title or interest in or to Saadi-Jones Productions, LLC or Vamprechaun Productions, LLC, or any partnership or other form of joint business organization with Mark Jones, George Saadi, Saadi-Jones Productions, LLC or Vamprechaun Productions, LLC, the Ferraros (John Ferraro, Sr. or Jon Cafaro Ferraro), or Mansky Productions, LLC, or any claim of entitlement to unpaid compensation or other benefits under any contract with  Jones, Saadi or Vamprechaun Productions (including without limitation any contract for the rendering by Lance Eric Thompson of legal services).

46.     Under the pertinent provisions of the Bankruptcy Code, and the case law construing and applying it, all equity interests in businesses, all intellectual property rights, and all claims or choses in action, if, as and to the extent actually owned (or claimed to be owned) by either of Defendants Lance Eric Thompson and Connie Diane Thompson, automatically became part of the bankruptcy estate in each of the aforesaid bankruptcies upon the filing of their Petitions therein, whether or not such assets were listed in the schedules and other filings of such bankruptcy.  As such, each of Defendants Lance Eric Thompson and Connie Diane Thompson automatically ceased to have any rights, title or interests therein as of such date, as a matter of law.  Consequently, neither of them could thereafter lawfully claim any such right, title or interest.

47.     Furthermore, under the pertinent provisions of the Bankruptcy Code, and the case law construing and applying it, when filing their Petitions, supporting schedules and other filings with the Court in each said bankruptcy, Defendants Lance Eric Thompson and Connie Diane Thompson each swore under penalty of perjury that all matters of fact set forth therein were true and correct.

48.     In the Notice of Available Chapters in the 2015 Bankruptcy (signed and verified as received by each of Lance Eric Thompson and Connie Diane Thompson on May 29, 2015), Defendants Lance Eric Thompson and Connie Diane Thompson were officially advised in writing that "A person who knowingly and fraudulently conceals assets or makes a false oath or statement under penalty of perjury, either orally or in writing, in connection with a bankruptcy case is subject to a fine, imprisonment, or both. . . . Section 521(a)(1) of the Bankruptcy Code requires that you promptly file detailed information regarding you creditors, assets, liabilities, income, expenses and general financial condition. . . ."

49.     In their 2015 Bankruptcy, Defendants Lance Eric Thompson and

Connie Diane Thompson swore under penalty of perjury that

a)      they had <u>no</u> stocks and interests in any corporations or unincorporated businesses (Schedule B, Item 13);

b)      The only interest either had in any partnerships or joint ventures consisted of a "50% interest in Scorned Productions, LLC," and no other(s)(Schedule B, Item 14);

c)      They had no contingent or unliquidated claims of any nature (Schedule B, Item 21); and

d)      The only patents, copyrights or other intellectual property in which they had any interests consisted of a "50% interest in Littlest Angel, LLC," an no other(s)(Schedule B, Item 22).

50.    In their 2016 Bankruptcy, Defendants Lance Eric Thompson and Connie Diane Thompson swore under penalty of perjury that

a)      The only patents, trademarks, trade secrets, and other intellectual property in which they had any interests consisted of "'The Littlest Angel" movie and 'Elf Bowling: The Movie' and Internet websites 'The AvaStore,com' and 'The AvaStore.net" (Schedule A/B, Item 26);

b)      <u>No</u> "other amounts someone owes you" (Schedule A/B, Item 30);

c)      <u>No</u> "claims against third parties, whether or not you have filed a lawsuit or made a demand for payment" (Schedule A/B, Item 33);

d)      <u>No "other contingent or unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims"</u> (Schedule A/B, Item 34);

e)      No interests in any partnerships or joint ventures, except for a 50% interest in Portsmouth Pictures, LLC (Schedule A/B, Item 42); and

f) No executor contracts or unexpired leases (Schedule G).

51. If, at any time since May 18, 2015, either of Defendants Lance Eric Thompson and Connie Diane Thompson has claimed or claims any such rights, title or interests in any such assets as described herein above, they were and are (a) admitting they committed perjury and violated the criminal laws of the United States by concealing the same in their bankruptcy filings, and (b) barred from making such claims now, since, as a matter of law, because they no longer owned or own any such assets, since the filing of their 2015 and 2016 Bankruptcies.

52. Defendant Lance Eric Thompson's wife Connie Diane Thompson is included as a Defendant in certain claims for relief set forth herein because, in so far as Lance Eric Thompson (in his own name or in the name of Portsmouth Pictures) claims that during the Thompsons' marriage, and at the time of the any or all of the aforesaid 2009, 2015 and 2016 Bankrupcties, Lance Eric Thompson and/or Portsmouth Pictures had a partnership with Jones, Saadi and/or Vamprechaun Productions and/or any rights, title or interests in or to the "Vamprechaun" character, script, project and/or production, such interests would have been community property.  Moreover, the Thompsons' filed their 2015 and 2016 Bankruptcies jointly, as husband and wife and as joint debtors, so that any determination in this action as to what constituted their assets or liabilities, or what was not disclosed or was waived, in those Bankruptcies, affects both of them and both of their interests, jointly and severally.

53. Neither Jones, nor Saadi, nor Vamprechaun Productions has ever promised, sold, gifted, granted, licensed, transferred or otherwise conveyed to Defendants or any of them, by any means or in any manner whatsoever, any right, title or interest in and to either the "Vamprechaun" character or Jones's script entitled "Vamprechaun," or in and to the copyrights or other rights of any kind or

nature whatsoever therein, or related thereto.   Neither Jones, nor Saadi, nor Vamprechaun Productions has ever consented to, permitted, authorized or ratified any acts by Defendants, or any of them, wherein said Defendant(s) asserted any right, title or interest of any kind or nature whatsoever in or to either the "Vamprechaun" character or Jones's script entitled "Vamprechaun," or with respect to the "Vamprechaun" project or production.   At no time has Jones, Saadi or Vamprechaun Productions ever had any partnership or other form of joint business entity with Defendants, or any of them, arising from or in any way relating to the "Vamprechaun" character, script, project or production.

## FIRST CLAIM FOR RELIEF

(Copyright Infringement – By Jones Against Defendant Lance Eric Thompson)

54.     Jones realleges and incorporates herein by reference as if set forth at length each and all of the allegations set forth in Paragraphs 1 through 53, inclusive, herein above.

55.     Through the conduct alleged herein above, Defendant Lance Eric Thompson has infringed Plaintiff Jones's copyright and exclusive rights in the copyrighted script entitled "Vamprechaun" by Mark Jones, without Jones's consent, permission, authorization or ratification, in violation of the Copyright Act, 17 U.S.C. §101 et seq.

56.     On information and belief, the aforesaid acts of infringement by Defendant Thompson have been willful and intentional, in disregard of and with indifference to the rights of Jones.

57.     As a direct and proximate result of Defendant Thompson's infringement of Jones's copyrights and exclusive rights under copyright, Jones is entitled to recover Jones's actual damages and Defendant Thompson's wrongfully obtained profits, if any, arising from or relating to the infringement of Jones's

copyrighted script entitled "Vamprechaun."

58.   Alternatively, Jones is entitled to the statutory damages, pursuant to 17 U.S.C. §504(c), in the amount of as much as $150,000 with respect to Jones's copyrighted script entitled "Vamprechaun", or such other amount as may be proper under 17 U.S.C. §504(c).

59.   Jones is further entitled to an award of Jones's reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 17 U.S.C. §505.

60.   Defendant Thompson's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Jones great and irreparable injury that cannot fully be compensated or measured in money.  Jones has no adequate remedy at law.  Pursuant to 17 U.S.C. §502, Plaintiff is entitled to injunctive relief prohibiting further infringements of Jones's copyright in Jones's script entitled "Vamprechaun."

## SECOND CLAIM FOR RELIEF

(Slander of Title –

By Jones and Vamprechaun Productions Against Lance Eric Thompson)

61.   Jones and Vamprechaun Productions reallege and incorporate herein by reference as if set forth at length each and all of the allegations set forth in Paragraphs 1 through 53, inclusive, herein above.

62.   Jones was and is the sole and exclusive creator of the "vamprechaun" character.  Jones is the sole and exclusive author and owner of all rights, title and interest in and to his copyrighted script entitled "Vamprechaun."  Vamprechaun Productions is the sole and exclusive owner of all rights, title and interest in the motion picture project and production with the working title "Vamprechaun" (the "'Vamprechaun' Project) based on that script.

63.   By means of Thompson's wrongful acts complained of herein,

including without limitation Thompson's false and malicious communications with the Ferraro's (and possibly with one or more errors and omissions insurance and completion bond companies), in which Thompson falsely claimed an interest in the "vamprechaun" character, by implication the "Vamprechaun" script, and the "Vamprechaun" project as a whole, Thompson disparaged the rights, title and interests therein of Jones and Vamprechaun Productions.

64.    In asserting to the Ferraros (and possibly, as threatened, to other persons or entities whose identity is as yet unknown to Plaintiff) that he was "co-creator" of the "vamprechaun" character, "partner" of Jones with respect to the "Vamprechaun" project, and therefore implying that he was an owner of the exclusive rights to create and exploit the "Vamprechaun" script that was registered for copyright by Jones and implying that he was an owner of any other rights relating to the project, Defendant Lance Eric Thompson intended for publication of his statements to result in harm to the interests of Plaintiffs having a pecuniary value, or either recognized or should have recognized that his statements were likely to do so.   Moreover, he knew that his statements were false or acts in reckless disregard of their truth or falsity, and were likely to result in pecuniary harm to Plaintiffs through the acts or omissions of third persons in respect of Plaintiffs' interest in the said properties.   In making such statements disparaging the title of Plaintiffs in and to the "vamprechaun" character, the "Vamprechaun" script and the "Vamprechaun" project as a whole, and especially in making such statements in the manner and context in which he did so, Defendant Lance Eric Thompson was not protected by any legally recognized privilege.

65.    As a direct and proximate result of Defendant's conduct, Plaintiffs have each sustained, and will continue to sustain, substantial injury, loss and damages, the exact amounts of which Plaintiffs have not yet been able to ascertain.

Plaintiffs will seek leave of Court to amend this Complaint to allege the exact amount of such damage if, when and to the extent such amount can be ascertained. In particular, but without limitation, Jones and Vamprechaun Productions have suffered actual, direct economic damages, including without limitation the loss of financing of the entire "Vamprechaun" project from Mansky Productions, the consequent loss of Vamprechaun Productions' production fees that it would have received under the budget for the project and of Vamprechaun Productions' interest in lost profits from exploitation of the motion picture "Vamprechaun," and Jones's loss of the compensation he would have received, under the budget, as writer and owner of the script for "Vamprechaun" and as director of the motion picture.

66.     In engaging in the conduct of which Plaintiffs complain herein, Defendant has acted with oppression, fraud and malice, with the intent to cause injury to Plaintiffs and/or in reckless disregard of the rights and interests of Plaintiffs, and Plaintiffs are consequently entitled to an award of punitive and exemplary damages against Defendant, in an amount to be determined by the trier of fact, and all according to proof, but in no event less than $1,000,000.

67.     Defendant's wrongful acts have proximately caused and will continue to cause Plaintiffs, and each of them, substantial injury. The harm these wrongful acts will cause to Plaintiffs is both imminent and irreparable, and the amount of damage sustained by Plaintiffs will be difficult to ascertain if these acts continue. Plaintiff has no adequate remedy at law.  Accordingly, Plaintiffs are also entitled to a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining Defendant, and all persons acting with, under, for or in concert with Defendant, from continuing to engage in further such unlawful conduct.

**THIRD CLAIM FOR RELIEF**

(Declaratory Relief – By All Plaintiffs Against All Defendants)

68.     Plaintiffs reallege and incorporate herein by reference as if set forth at length each and all of the allegations set forth in Paragraphs 1 through 67, inclusive, herein above.

69.     Plaintiffs contend, and on information and belief Defendants and each of them deny, that:

a)     In or before 2009, Jones, alone, created the idea for a fictitious character he termed the "vamprechaun"—part vampire and part leprechaun--  of which Jones was and is the sole and exclusive creator;

b)     Thompson was not a "creator," "co-creator," "author" or "co-author" of the "vamprechaun" character;

c)     Defendants have no right, title or interest whatsoever in or to the "vamprechaun" character;

d)     Jones was and is the sole and exclusive author of his script entitled "Vamprechaun;"

e)     Jones is the sole and exclusive owner of exclusive rights, under the Copyright Act (17 U.S.C. Sec. 101 et seq.) and other laws of the United States and the State of California, in and to that certain literary work consisting of the script entitled "Vamprechaun;"

f)     Jones is the sole author and copyright claimant with respect to the copyright in the script registered with the Register of Copyrights, U.S. Copyright Office, as a literary work completed in 2013, issued copyright registration number TXu 2019581;

g)     Thompson had no part whatsoever in the authoring of the "Vamprechaun" script;

h)       Thompson has no copyright or other rights, title or interest in or to the script entitled "Vamprechaun" that was registered by Jones with the Register of Copyrights, U.S. Copyright Office, nor any right, title or interest in or to Jones' Writers Guild of America West, Inc., registration of said script;

i)       At no time has Jones, Saadi or Vamprechaun Productions ever had any partnership or other form of joint business entity with Defendants, or any of them, arising from or in any way relating to the "Vamprechaun" character, or the "Vamprechaun" script, project or production;

j)       There was never any other agreement between Plaintiffs, or any of them, and Defendants, or any of them, for Thompson to be compensated for any time or efforts he expended, or any expenses he may have incurred, in connection with the "Vamprechaun" project;

k)       Any discussions between Jones and Thompson regarding the possibility of Thompson (or Portsmouth Pictures) becoming involved in the "Vamprechaun" project, or receiving any credit or compensation relating thereto, was premised and conditioned entirely on Thompson obtaining the financing for the project, which Thompson never succeeded in doing;

l)       Neither Jones, nor Saadi, nor Vamprechaun Productions has ever promised, sold, gifted, granted, licensed, transferred or otherwise conveyed to Defendants or any of them, by any means or in any manner whatsoever, any right, title or interest in and to either the "Vamprechaun" character or Jones's script entitled "Vamprechaun," or in and to the copyrights or other rights of any kind or nature whatsoever therein, or related thereto;

m)       Neither Jones, nor Saadi, nor Vamprechaun Productions has ever consented to, permitted, authorized or ratified any acts by Defendants, or any of them, wherein said Defendant(s) asserted any right, title or interest of any kind

or nature whatsoever in or to either the "Vamprechaun" character or Jones's script entitled "Vamprechaun," or with respect to the "Vamprechaun" project or production;

n)     In delivering his legal opinion letter of July 30, 2016, to the Ferraros, preparing papers relating to seeking tax credits from the State of Ohio (including preparing a proposed "budget" for the "Vamprechaun" project and a draft "Film Financing Agreement," and in holding himself out to third parties as supposedly being the intended production legal counsel for the project), Defendant Lance Eric Thompson, who was not at the time licensed to practice law in any state of the United States, was unlawfully engaging in the unauthorized practice of law without a license;

o)     Assuming it could ever be determined that Defendant Lance Eric Thompson and/or Defendant Connie Diane Thompson ever had any authorship, ownership, trademark or copyright rights, title or interests in either the "vamprechaun" character or the "Vamprechaun" script, or any partnership or other form of joint business organization with Plaintiffs or any of them, such rights, title or interests would have been assets that were necessarily within the scope of their 2015 and 2016 Bankruptcies, and which therefore would have automatically devolved to the bankrupt estate, such that neither Defendant Lance Eric Thompson nor Defendant Connie Diane Thompson can have had any such asset or interest since the discharge and closing of their Bankruptcies under Chapters 7 and 13;

p)     By virtue of having failed to identify, claim and include any such assets, rights, title or interests in their bankruptcy filings, Defendant Lance Eric Thompson and Defendant Connie Diane Thompson are each now estopped to assert that any such assets, rights, title or interests ever in fact existed at all, and have waived any such claims, assets, rights, title or interests; and

q)      Since at least the filing of their 2015 Bankruptcy, as well as since the filing of their 2016 Bankruptcy, and by virtue of such bankruptcy proceedings, Defendants Lance Eric Thompson and Connie Diane Thompson have not had, do not have, and cannot have any right, title or interest whatsoever in the "vamprechaun" character, the copyrighted "Vamprechaun" script, any aspect of the "Vamprechaun" project, or any alleged "partnership" or other form of joint business entity with any of Plaintiffs.

70.     An actual controversy has arisen between the parties, and a judicial declaration of the respective rights of the parties is necessary and appropriate at this time.

## FOURTH CLAIM FOR RELIEF

(Intentional Interference with Prospective Economic Advantage –

By All Plaintiffs Against Defendant Lance Eric Thompson)

71.     Plaintiffs reallege and incorporate herein by reference as if set forth at length each and all of the allegations set forth in Paragraphs 1 through 67, inclusive, herein above.

72.     As alleged herein above, throughout the period from mid July through early December 2016 an economic relationship existed between Plaintiffs, and each of them, on the one hand, and the Ferraros and Mansky Productions LLC, on the other hand, with the probability of future economic benefits to Plaintiffs. Under and pursuant to the aforesaid Terms and Conditions, Plaintiff's receipt of such future economic benefits was imminent as of October 20, 2016.

73.     Defendant Thompson knew of the said economic relationship between Plaintiffs, and each of them, on the one hand, and the Ferraros and Mansky Productions LLC, on the other hand.

74.     Defendant Thompson engaged intentionally in the aforesaid acts on

his part, including in particular but without limitation his communications with the Plaintiffs and with the Ferraros in and after September 2016, which were designed to disrupt the relationship.

75.   Defendant Thompson's said acts caused actual disruption of the said relationship between Plaintiffs, and each of them, on the one hand, and the Ferraros and Mansky Productions LLC, on the other hand. But for Defendant Thompson's interference, it is reasonably probable that the aforesaid Terms and Conditions pertaining to the "Vamprechaun" project would have been signed forthwith, the project funded by Mansky Productions, LLC, the payments made to Jones and Saadi as writer, director and producers, the motion picture shot, completed, released and exploited, and revenues generated thereby for Vamprechaun Productions from commercial activities emanating from the project (including without limitation from box office receipts, television licensing and video distribution, merchandising, and other avenues of exploitation of the property). Defendant Thompson knew that his actions were certain or substantially certain to interfere with the relationship between Plaintiffs, and each of them, on the one hand, and the Ferraros and Mansky Productions LLC, on the other hand.

76.   Defendant Thompson's said acts of interference, including in particular but without limitation his false claims asserted to Jones in September 2016 and his false assertions to the Ferraros on October 20, 2016, and thereafter, were fraudulent and deceptive, aimed at placing Plaintiffs under duress by threatening to sabotage the "Vamprechaun" project as a whole by interfering with its financing and insurability.

77.   As a direct and proximate result of Defendant Thompson's conduct, Plaintiffs have each sustained, and will continue to sustain, substantial injury, loss and damages, the exact amounts of which Plaintiffs have not yet been able to

ascertain.  Plaintiffs will seek leave of Court to amend this Complaint to allege the exact amount of such damage if, when and to the extent such amount can be ascertained.

78.    In engaging in the conduct of which Plaintiffs complain herein, Defendant Thompson has acted with oppression, fraud and malice, with the intent to cause injury to Plaintiffs and/or in reckless disregard of the rights and interests of Plaintiffs, and Plaintiffs are consequently entitled to an award of punitive and exemplary damages against Defendant Thompson, in an amount to be determined by the trier of fact, and all according to proof, but in no event less than $1,000,000.

79.    Defendant Thompson's wrongful acts have proximately caused and will continue to cause Plaintiffs, and each of them, substantial injury. The harm these wrongful acts will cause to Plaintiffs is both imminent and irreparable, and the amount of damage sustained by Plaintiffs will be difficult to ascertain if these acts continue. Plaintiff has no adequate remedy at law.  Accordingly, Plaintiffs are also entitled to a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining Defendant Thompson, and all persons acting with, under, for or in concert with Defendant Thompson, from continuing to engage in further such unlawful conduct.

## FIFTH CLAIM FOR RELIEF

(Negligent Interference with Prospective Economic Advantage –

By All Plaintiffs Against Defendant Lance Eric Thompson)

80.    Plaintiffs reallege and incorporate herein by reference as if set forth at length each and all of the allegations set forth in Paragraphs 1 through 60, inclusive, 72, 73 and 76 herein above.

81.    It was reasonably foreseeable that the wrongful conduct by Defendant Thompson would interfere with or disrupt the economic relationship between

Jones, et al. v. Thompson et al.,
2:17-cv-1619                                      34                                      Complaint

Plaintiffs, and each of them, on the one hand, and the Ferraros and Mansky Productions LLC, on the other hand, if Defendant Thompson failed to exercise due care.

82.    Defendant Thompson was negligent in his conduct, that is, he failed to exercise due care.

83.    As aforesaid, the said economic relationship was actually interfered with or disrupted, and the above-described conduct of Defendant Thompson caused Plaintiffs damage, namely, Plaintiffs and each of them lost in whole or in part the economic and other benefits or advantages from the said economic relationship.

84.    As a direct and proximate result of Defendant's conduct, Plaintiffs have each sustained, and will continue to sustain, substantial injury, loss and damages, the exact amounts of which Plaintiffs have not yet been able to ascertain. Plaintiffs will seek leave of Court to amend this Complaint to allege the exact amount of such damage if, when and to the extent such amount can be ascertained.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants, as follows:

ON THE FIRST CLAIM FOR RELIEF (COPYRIGHT INFRINGEMENT):

1.    For money damages in such amount as may be found, or as otherwise permitted by law, including without limitation Plaintiff Jones's actual damages and recovery of Defendants' and each of their wrongfully gotten profits, or in the alternative, in Plaintiff Jones's discretion and should Jones so elect, statutory damages;

2.    For an accounting of, and the imposition of a constructive trust with respect to, Defendants' revenues, benefits and profits attributable to their

infringements of Plaintiff Jones's copyrighted script entitled "Vamprechaun;"

3.      For a preliminary and permanent injunction prohibiting Defendants, and their respective agents, servants, employees, officers, successors, licensees, partners and assigns, and all persons acting in concert or participation with each of any of them, from directly or indirectly infringing, and/or causing, enabling, facilitating, encouraging, promoting, inducing and/or participating in the infringement of, any of Jones's copyrights in Plaintiff Jones's copyrighted script entitled "Vamprechaun;"

4.      For Plaintiff Jones's attorneys' fees, costs and disbursements in this action;

ON THE SECOND CLAIM FOR RELIEF (SLANDER OF TITLE):

5      For the damages suffered by Plaintiffs Jones and Vamprechaun Productions as a result of the slander of title, according to proof;

6.      For punitive and exemplary damages against Defendant Thompson, in an amount to be determined by the trier of fact, and all according to proof, but in no event less than $1,000,000;

7.      For a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining Defendant Thompson, and all persons acting with, under, for or in concert with Defendant Thompson, from continuing to engage in further unlawful conduct as that complained of herein.

ON THE THIRD CLAIM FOR RELIEF (DECLARATORY RELIEF):

8.      That the Court declare and adjudge that the contentions, and each of them, of Plaintiffs Jones, Saadi and Vamprechaun Productions, as set forth in Paragraph 69 of this Complaint, are true and correct;

ON THE FOURTH CLAIM FOR RELIEF (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE):

Jones, et al. v. Thompson et al.,
2:17-cv-1619

36

Complaint

9.     For the damages suffered by Plaintiffs Jones, Saadi and Vamprechaun Productions, and each of them, as a result of Defendant Thompson's intentional interference with Plaintiffs' prospective economic advantage, according to proof;

10.     For punitive and exemplary damages against Defendant Thompson, in an amount to be determined by the trier of fact, and all according to proof, but in no event less than $1,000,000;

ON THE FIFTH CLAIM FOR RELIEF (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE):

11.     For the damages suffered by Plaintiffs Jones, Saadi and Vamprechaun Productions, and each of them, as a result of Defendant Thompson's negligent interference with Plaintiffs' prospective economic advantage, according to proof;

ON ALL CLAIMS FOR RELIEF:

5.     For prejudgment interest according to law;

6.     For Plaintiffs' costs of suit incurred herein; and

7.     For such other and further relief in favor of Plaintiffs as the Court may deem just and proper.

Dated: February 28, 2017                    Respectfully Submitted,

                                            **ALAN G. DOWLING, P.C.**

                                            By: /s/ Alan G. Dowling
                                            **Alan G. Dowling**
                                            (California Bar No. 70686)
                                            **ALAN G. DOWLING, P.C.**
                                            1043 Pacific Street, No. 1
                                            Santa Monica, California 90405
                                            Telephone: (818) 679-6395
                                            Fax: (424) 238-5366
                                            Email: agdowling@aol.com
                                            *Attorney for Plaintiffs*

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a trial by jury on all issues so triable under or

3

pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh

4

Amendment to the United States Constitution.

5

6

Dated: February 28, 2017                    Respectfully Submitted,

7

8                                            **ALAN G. DOWLING, P.C.**

9                                            By:  /s/ Alan G. Dowling

10                                           **Alan G. Dowling**
                                             (California Bar No. 70686)
11                                           **ALAN G. DOWLING, P.C.**
12                                           1043 Pacific Street, No. 1
                                             Santa Monica, California 90405
13                                           Telephone: (818) 679-6395
14                                           Fax: (424) 238-5366
                                             Email: agdowling@aol.com
15                                           *Attorney for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28